UNITED STATES *v.* LEONARD ZWYNS (No. 4672) [1]

---

[1] C. A. D. 467.

United States Court of Customs and Patent Appeals, November 7, 1951

*David N. Edelstein*, Assistant Attorney General (*Arthur R. Martoccia*, special attorney, of counsel), for the United States.
*Pemberton & Orloff* for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

O'CONNELL, Judge, delivered the opinion of the court:

This appeal was taken by the Government from the judgment of the United States Customs Court, First Division, entered pursuant to its decision, C. D. 1279.

Appellee, Leonard Zwyns, during the period beginning September 30 and ending October 25, 1946, made entry at Blaine, Washington, a subport of Seattle, of 15 different lots of merchandise invoiced as "fresh salmon eggs." The shipments, alleged to weigh 32,280 pounds, were covered by invoices attached to the entries, and all of the invoices and all of the entries bore the notation "Unfit for Human Consumption."

The invoices were prepared by employees of the foreign shipper, British Columbia Packers, who handled the shipments at its cannery. The entries were prepared by various customs inspectors of the United States Government employed at the port of entry, following their official examination there of the imported merchandise.

Appellee operated two processing plants near the Canadian border, one under a trade name as the West Coast Fish & Fish Products Company at Steveston, British Columbia, and the other at Lynden, Washington, where the merchandise after importation was delivered. Both plants were used by appellee for processing salmon eggs for bait, and the Canadian plant was used exclusively for that purpose.

Salmon eggs unfit for human consumption and used for bait are free of duty under paragraph 1671 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1671)[1] and were so entered by appellee. The Collector of Customs adopted appellee's entered classification and liquidated the entries on that basis.

---

[1] Sec. 1201. Free list. On and after June 18, 1930, except as otherwise specifically provided for in this chapter, the articles mentioned in the following paragraphs, when imported into the United States * * * shall be exempt from duty:
Par. 1671. Eggs of birds, fish, and insects (except fish roe for food purposes) * * *.

Thereafter, and within a few days of the expiration of the two-year period of limitation as to the exercise of the power to reliquidate conferred upon him by section 521 of the Tariff Act of 1930,[2] the collector, indicating evidence had been produced showing to his satisfaction probable fraud existed with respect to the 15 entries, reliquidated them because of alleged incorrect weights upon which'they were based, and because the imported merchandise was allegedly commingled with dutiable and unsegregated merchandise within the purview of section 508 of the Tariff Act of 1930.[3]

By the reliquidation the merchandise was classified as fish roe for food purposes, under paragraph 721 (d) of the Tariff Act of 1930, as amended by the trade agreement with Iceland, 79 Treas. Dec. 79, T. D. 50956,[4] and assessed the goods with duty at 10 cents per pound on an aggregate weight of 72,625 pounds, the cost of the assessment thus amounting to $7,262.50. This assessment was based on the premise that some of the imported salmon eggs, all of which amounted to 72,625 pounds, were fit for human food and others were suitable solely for bait; hence all of the merchandise, none of which was segregated, became "subject to the highest rate of duty applicable to any part thereof."

One of the contentions made in the brief filed on behalf of the Government relates to the matter of the burden of proof in cases where the collector reliquidates entries under section 521, *supra*.

We quote the following from the brief:

In cases involving reliquidations under Section 521 and prototype provisions in prior tariff acts, it has been held that so far as fraud is concerned, the Government is charged with the burden of proof. See *Vitelli* v. *United States*, 250 U. S. 355 (T. D. 38179); *Zucca* v. *United States*, 10 Ct. Cust. Appls. 133, T. D. 38399; *Geo. Wm. Rueff, Inc.* v. *United States*, 20 Cust. Ct. 72, C. D. 1087. However, under Section 521 of the Tariff Act of 1930, the Government is not charged with the burden of proving actual fraud, but merely that the Collector have 'probable cause' to believe fraud existed at the time of liquidation. In the *Vitelli* and *Zucca* cases cited, *supra*, wherein it was held that the Government was charged in such cases with the burden of proving fraud, the courts had under consideration Section

[2] Sec. 521. RELIQUIDATION ON ACCOUNT OF FRAUD.

If the collector finds probable cause to believe there is fraud in the case, he may reliquidate an entry within two years (exclusive of the time during which a protest is pending) after the date of liquidation or last reliquidation.

[3] Sec. 508. COMMINGLING OF GOODS.

Whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise can not be readily ascertained by the customs officers, the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof, unless the importer or consignee shall segregate such merchandise at his own risk and expense under customs supervision within ten days after entry thereof, in order that the quantity and value of each part or class thereof may be ascertained.

[4] United States Tariff Act of 1930

| Paragraph | Description of article | Rate of duty |
|---|---|---|
| 721 (d)_____ | Caviar and other fish roe for food purposes (except sturgeon): | |
| | Boiled and packed in air-tight containers, whether or not in bouillon or sauce_____ | 15% ad valorem |
| | Other_____ | 10¢ per pound |

21 of the Tariff Act of June 22, 1874 (18 Stat. at Large 186, 190), which prescribed the period within which liquidation should become final 'in the absence of fraud' and did not contain the provision relating to 'probable cause' to believe fraud existed appearing in Section 521 of the present tariff act. The present provision for 'probable cause' was first introduced in the General Revision of the Administrative Provisions of the Tariff Act of 1922. In the *Rueff* case, cited *supra*, the Customs Court held with respect to the timeliness of the reliquidations that the only question was whether the Collector had probable cause to believe fraud existed—not whether fraud actually existed.

Therefore, the law under the present act requires the Collector to have only probable cause to believe the existence of fraud for him to reliquidate under Section 521 of the Tariff Act of 1930. What evidence, then, was before the Collector to occasion him to have probable cause to believe the existence of fraud in the liquidations of the involved entries?

To the foregoing it may be added that in the *Vitelli* case, cited in the brief, the Supreme Court reversed the judgment of this court. (See *Vitelli & Son* v. *United States*, 7 Ct. Cust. Appls. 243, T. D. 36544 in 30 Treas. Dec. 1191.) The pertinent statute then in force was section 21 of the (Tariff) act of 1874, 18 Stat. 186,190, which was quoted in the opinion of the Supreme Court as follows:

That whenever any goods, wares, and merchandise shall have been entered and passed free of duty, and whenever duties upon any imported goods, wares, and merchandise shall have been liquidated and paid, and such goods, wares, and merchandise shall have been delivered to the owner, importer, agent, or consignee, such entry and passage free of duty and such settlement of duties shall, after the expiration of one year from the time of entry, in the absence of fraud and in the absence of protest by the owner, importer, agent, or consignee, be final and conclusive upon all parties.

The Zucca case, also cited in the brief for the Government, was decided by this court (see 10 Ct. Cust. Appls. 133, T. D. 38399 in 38 Treas. Dec. 387) after the decision of the Supreme Court in the *Vitelli* case, *supra*, (the decision shows that it was held here awaiting the latter decision) and this court, of course, then followed the Supreme Court.

The case of *Rueff, Inc., supra*, to which the Government's brief further refers, was not appealed. That case, however, was tried under section 521 of the act of 1930 and, to quote from the decision of the trial court, it was "admitted on the part of the Government that the burden of proving 'probable cause to believe there is fraud in the case' rests upon it."

In the instant case we do not find it necessary to our decision to pass upon the contention of counsel for the Government to the effect that the phraseology of section 521 relieves counsel for the Government, acting for the Collector of Customs, of the burden of showing probable cause for the belief that fraud existed at the time of the original liquidation, and we refrain from so doing. There was no discussion of the contention in the decision of the trial court, nor is it discussed in the brief for appellee before us. Whatever may

have been the view of counsel for appellee, they seemed to have assumed the burden of proving a negative.

The evidence was taken at Seattle, Washington, September 26, 1949, Chief Judge Oliver presiding as a single judge on circuit. The case was heard there and submitted on the testimony of four witnesses for appellee and three for the Government. In addition to the facts hereinbefore stated, the issue was concisely set forth and evidence introduced accordingly by Monford A. Orloff, counsel for appellee Zwyns, tending to establish—

that Mr. Zwyns, who conducted a bait business in Stevenson, British Columbia, actually did purchase, during this period, from the British Columbia Packers and other packing companies, a substantial number of eggs in excess of the amount entered, that the actual amount entered was as displayed on the informal entries and as inspected by some eight different Customs inspectors at the Blaine port of entry, and that he used the remaining eggs in his business in British Columbia where he manufactured bait. I think the evidence will also show that the eggs were sold at the going price for bait purposes, that no eggs were sold at a price which would take into consideration the amount of Customs due if they were imported for food purposes, and that all the eggs actually imported were not fit for food purposes, never having been refrigerated or otherwise treated before importation.

Among other things, the record in behalf of appellee contains the following pertinent excerpts:

By Mr. Orloff:

Q. Mr. Zwyns, I am going to show you several informal entries all of which, except one, are supported by invoices of Edmunds & Walker Limited, subsidiary of British Columbia Packers. I show you No. 499977. Is that your signature at the bottom of that entry? A. Yes, sir, that is my signature.

Q. Mr. Zwyns, is that a typical entry made of these several entries which are in question before the Court? A. That's right.

Q. Did you make out the entry itself? A. No, the Customs inspector makes out the entry.

Q. At the time of all of these entries, Mr. Zwyns, did a Customs inspector inspect your load? A. Yes, he inspects the load before the entry is made.

Q. He filled out the number of cans? A. That's right.

Q. And the weight? A. That's right.

Q. Was that on information furnished by yourself or did he actually make an inspection?

A. He actually made an inspection.

\*        \*        \*        \*        \*        \*        \*

Q. Mr. Zwyns, during the period, September 30 to October 26, 1946, did you sell any eggs in Seattle in addition to those set out in these entries? A. Yes.

Q. Where did those eggs come from? A. From my home plant in Lynden, Washington.

Q. From your home plant in Lynden? A. That's right.

Q. How did they get to your own plant in Lynden, Washington? A. Previous invoice.

Q. How long had you been importing them prior to this time? A. Since 1943.

Q. Did you usually have eggs on hand from the prior year? A. Yes, I always had eggs on hand.

Q. Have you sold any eggs recently that you had on hand for any period of time?   A. I sold some bottled eggs this spring [1949] in bottles, a 1946 crop.

Q. Did you ever have any eggs in bulk that you sold?   A. Yes.

The record further discloses that during the period covered by the involved entries appellee had purchased more than 68,000 pounds of salmon eggs from Edmunds & Walker, the sales agent for the British Columbia Packers, Limited, the greater part of which eggs were delivered to appellee's plant located in British Columbia.   And there is no .contradiction, whatsoever, of appellee's testimony which described the extremely unsanitary manner in which the eggs in question were obtained in the process of dressing fresh salmon at the cannery in British Columbia.

The eggs were part of the offal carried for disposal on a transmission belt.   After running its course of about 50 feet, the eggs were then removed from the belt and placed in 5-gallon, second-hand, tin cans that were used over and over again for such purpose.   The cans were not sterilized nor maintained in an antiseptic condition.   No preservatives of any kind were used when the eggs were put in the metal containers or during their transportation in trucks to appellee's plant in Lynden, Washington.

Before exportation of the eggs here in issue many of them had deteriorated to such an extent as to create an acid poisonous to the human system and turning the color of the eggs in such a manner as to render them unfit for human consumption and repulsive to the senses.

The Government attempted to establish that during the period in question the Main Fish Company made purchases from appellee of part of the imported merchandise and manufactured it into caviar which was sold in the United States "mostly to the Japanese trade" and some of it exported to Hawaii.   In support of those transactions, the Government offered certain collective exhibits which upon examination disclosed that the merchandise thus sold by the Main Fish Company had been purchased from the West Coast Fish & Products Company in British Columbia and consisted of importations made by the Main Fish Company and not by the appellee.   As the decision of the court below pointed out, support for this conslusion is found in testimony on cross-examination to the effect that the Main Fish Company had previously imported salmon eggs from British Columbia for which it was fined and paid approximately $1,500.00 as duty thereon.

The Government also offered in evidence several of the Canadian shipper's official invoices which showed deliveries of salmon eggs to appellee for which payment was made.   Each invoice bears a date the same as an entry in question, and the quantity stated on the invoice exceeds the amount set forth on the entry for the correspond-

ing date. In the aggregate, the Government contended, 40,000 or more pounds of salmon eggs thus found their way into the United States under the 15 entries covering the importations hereinbefore described.

The testimony of other witnesses was introduced as well as additional invoices. However, the testimony and the evidence on the part of the Government was unacceptable to the court below as contradictory of appellee's contentions. The court pointed out it was inconceivable that such merchandise, handled and shipped under the conditions disclosed by the record, could be accepted and regarded, not to say actually used, for food purposes. The difficulty with the invoices relied upon by the Government was the deficiency in the proof as to whether they covered sales of salmon eggs made to appellee for export or for delivery to his Canadian plant.

The dual capacity in which appellee transacted his business on both sides of the border appears to have been a source of suspicion and confusion, although such a legal situation is not of itself fraudulent. However, the judges of the First Division, including the Chief Judge, before whom the evidence was taken, pointed out in their unanimous decision that the record of the evidence in this case is not as clear as it might be. The testimony contains evasive, contradictory, and indefinite statements.

Nevertheless we are convinced that, in accordance with established procedure, the weight of the evidence, both on the question of reliquidation [5] and the question of unfitness of the entries for food purposes, supports the findings of fact and the decision of the lower court in sustaining appellee's protest.[6]

The judgment of the United States Customs Court is accordingly *affirmed*.

---

[5] See *United States* v. *Sherman*, 237 U. S. 146; *Vitelli & Son* v. *United States*, 250 U. S. 355; *United States* v. *Phillips*, 46 Fed. 466; *Geo. Wm. Rueff, Inc.* v. *United States*, 20 Cust. Ct. 72, C. D. 1087; *Pacific Brokerage Co.* v. *United States*, 3 Cust. Ct. 20, C. D. 193. See also *United States* v. *Waterbury Lock & Specialty Co.*, 35 C. C. P. A. (Customs) 131, C. A. D. 384; *New England Fish Co.* v. *United States*, 4 Cust. Ct. 230, C. D. 329.

[6] *United States* v. *Winograd Bros., Inc.*, 32 C. C. P. A. (Customs) 153, C. A. D. 302; *United States* v. *Flexideal Dry Mat Co.*, 23 C. C. P. A. (Customs) 270, T. D. 48113.

